[Cite as *State v. B.J.T.*, 2017-Ohio-8797.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-12-106 |
| | : | O P I N I O N |
| - vs - | | 12/4/2017 |
| | : | |
| B.J.T., | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 16CR31930

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Taft Stettinius & Hollister LLP, Aaron Herzig, Liane Rousseau, 425 Walnut Street, Suite 1800, Cincinnati, Ohio 45202, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, B.J.T., appeals from his conviction and sentence in the Warren County Court of Common Pleas for sexual battery and gross sexual imposition. For the reasons set forth below, we affirm in part, reverse in part, and remand the matter for resentencing.

{¶ 2} On April 29, 2016, appellant was indicted on eight counts of sexual battery in

violation of R.C. 2907.03(A)(5), felonies of the third degree, and on seven counts of gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(5), felonies of the fourth degree.[1] The charges arose out of allegations that appellant sexually abused H.T. over the course of eight months, from September 1, 2015 until April 21, 2016, when H.T. was 15 years old. Appellant was alleged to have engaged in sexual contact and conduct with H.T. by touching her chest and buttocks and by digitally penetrating her vagina.

{¶ 3} Appellant pled not guilty to the charges and a bench trial before Judge Michael E. Gilb commenced on October 17, 2016. At trial, the state presented testimony from H.T., H.T.'s mother, Carlisle Police Officer Kathleen Gee, and Warren County Sheriff's Detective Christopher Wong. H.T. testified that she was 16 years old and lived in a home in Carlisle, Warren County, Ohio with her mother, younger brother, and appellant.

{¶ 4} H.T. stated that shortly after she turned 15, appellant began to sexually assault her. The first incident occurred in September 2015, in the living room of their family home. H.T. was lying on the floor watching television when appellant sat down behind her and put his hands on her butt. When appellant moved his hands between her legs, she told him to stop. Appellant briefly removed his hands, but put them back a few seconds later. This time appellant placed his hands inside H.T.'s shorts and underwear and "put his fingers into the opening of [her] vagina." H.T. got off the floor and moved to a chair, but appellant followed her. He put his hands around the chair, with one hand on each arm of the chair so that he was facing her. Appellant told H.T. he was sorry and that "it wouldn't happen again." He also told her that she "better not tell anyone that it happened." H.T. explained that she was scared when appellant put his arms around the chair and told her not to tell anyone as

---

1. The indictment originally specified that the gross sexual imposition ("GSI") offenses were felonies of the third degree. During pretrial discussions, the court and the parties agreed that the indicted offenses were actually felonies of the fourth-degree, in accordance with R.C. 2907.05(C)(1). Appellant was later convicted of seven fourth-degree felony GSI offenses.

appellant, who is 6' 2" tall and weighs 325 pounds, is substantially bigger than her and he was in possession of a pocketknife. According to H.T., appellant was "playing around with [the pocketknife], like moving it around as he talked to [her]."

{¶ 5} A second incident occurred a few nights later, when appellant came into H.T.'s bedroom between 1:00 a.m. and 2:00 a.m., while she was sleeping. H.T. testified she awoke to find appellant's hand "up in between [her] legs" with his fingers inside her vagina. Appellant was kneeling by her bed, dressed only in his underwear, and was holding a flashlight. Neither H.T. nor appellant said anything to the other. H.T. rolled over to get appellant to remove his hand from between her legs. Shortly thereafter, appellant left H.T.'s bedroom.

{¶ 6} H.T. testified that after this event, appellant began sexually abusing her "a couple of times a week" until she reported his conduct on April 21, 2016. H.T. explained that the abuse always occurred in her bedroom during the early morning hours. Sometimes she could stop the abuse from happening by waking up as appellant entered her room. When this occurred, she would sit up and ask appellant what he was doing, and he would tell her he was checking out a noise he heard. Other times, H.T. would wake up after the abuse had already started and appellant was touching her. Appellant would be by her bed with a cellphone and pocketknife in hand. Appellant would use his cellphone as a flashlight. As for the pocketknife, appellant would either place the pocketknife on H.T.'s dresser or place it on the bed near H.T. H.T. testified, "I didn't know why he would have [the pocketknife]. He didn't have any pockets because he was never wearing anything but underwear, so I didn't know why he'd bring it with him." H.T. could not remember whether appellant pointed the pocketknife at her in a threatening manner, but stated he never verbally threatened her with the knife.

{¶ 7} H.T. detailed assaults that occurred in October, November, and December of

2015, as well as in January, February, March, and April of 2016. She testified that in October 2015, a day or two before Halloween, appellant came into her room sometime between 1:30 a.m. and 3:00 a.m. and woke her up by placing his fingers inside her vagina. Appellant had a flashlight with him at the time, but H.T. could not remember whether he had the pocketknife. In November 2015, appellant came into H.T.'s bedroom in the middle of the night in his underwear and touched her "inside her vagina." In December 2015, about two weeks before Christmas, appellant came into H.T.'s room at night and put his fingers inside her vagina. He did the same thing in January 2016, entering her room and touching her on the "inside of her vagina." In February 2016, about two days after Valentine's Day, and in March 2016, appellant again entered H.T.'s bedroom in the middle of the night and put his fingers inside her vagina. H.T. explained that when appellant came into her room on all of those occasions, he would also touch her chest and buttocks. She testified appellant's digital penetration of her vagina "sometimes" caused her pain and discomfort.

{¶ 8} H.T. did not disclose the abuse until April 21, 2016. On that date, H.T. was awakened in the early morning hours when appellant entered her bedroom, grabbed her chest, and put his fingers inside her vagina. Appellant was in his underwear at the time and had a flashlight with him. Later that morning, after H.T. left her home to attend school, H.T. texted appellant that he woke her up last night and she was going to disclose the abuse. Appellant apologized for his actions and begged H.T. not to tell anyone. The following text messages were exchanged:

H.T.: you woke me up last night

Appellant: When?

H.T.: when you came in my room

Appellant: I'm sorry.

H.T.: don't ever do that again, please, that's not okay

- 4 -

Appellant:   Never again.  I'm so sorry.  That was stupid and I know it.

Appellant:  I love you too much to be stupid.

Appellant:  And care too much about you.  Not sure what I was thinking but you can rest assured never again.

Appellant:  Ok

Appellant:  I promise.

Appellant:  Please answer me.

H.T.:  I need to tell mom about it tho because that's not okay an[d] it's not the first time you've done it.

Appellant:  Please don't.  I will never ever do something so stupid ever again.  Please be live [sic] me.  Please don't.  [H.T.], I know it was wrong.  And I am sick to [my] stomach.  I beg you to not say anything.  I never want our family destroyed because of my stupidity.  Please trust me.  Absolutely never will I be so f****** stupid again.  Please.

Appellant:  You are 100% right.  It's wrong and I am a f****** idiot.  But please give me the opportunity to make things right.

H.T.:  I have to that's not okay an[d] you already said it would never happen agai[n].

* * *

Appellant:   Please don't say anything to her.  I swear to you.  Absolutely never will anything like this go on [sic].  Never.

Appellant:  Please.

Appellant:  Give me one last opportunity.  I swear to god.  Never again.

Appellant:  You are so special to me.  And I don't want stupidity to hurt us.

Appellant:  Can you please not say anything and let me prove to you that I am totally sincere.

Appellant:  Please answer me.

Appellant: I have way to[o] much to lose. You all are so important to me and I just can't stand to lose you. I'm so sorry [H.T.].

Appellant: Please.

Appellant: Please trust me when I tell you that this will never happen again. I promise you. I got to have this one last chance. Please, I can't be without my family. I love you all way too much.

* * *

H.T.: I don't trust you.

Appellant: I know. And I'm so sorry. Please let me have the opportunity to regain your trust. I swear to you I am never ever going to do anything as stupid as that ever. It breaks my heart to know I have been such an idiot. Please. You and I can fix this together.

H.T. No, I don't trust you and I have to tell someone what you did.

{¶ 9} Once at school, H.T. disclosed the abuse to a friend, a teacher, and the principal. H.T.'s principal called the police and Officer Gee came to the school to talk to H.T. While Gee was taking H.T.'s statement, appellant continued to send text messages to H.T.'s cellphone.

{¶ 10} After obtaining H.T.'s statement and viewing the text messages appellant sent to H.T.'s phone, Gee had appellant arrested. H.T. went to Dayton Children's Hospital for a sexual assault examination. Although the examination did not reveal any abnormalities or injuries, the treating physician's final impression was "[s]exual child abuse, suspected."

{¶ 11} After appellant was arrested, he waived his *Miranda* rights and spoke with Detective Wong and another officer, Detective Englehardt. This interview was recorded and the recording was admitted into evidence at trial. During the interview, appellant admitted he made a "mistake" and touched H.T. "in places she shouldn't be touched." Although appellant denied penetrating H.T.'s vagina, he admitted that he touched her breasts and her vaginal

- 6 -

area "skin to skin" with his hands. He stated he had touched H.T. "maybe once a week for the last couple months," with the last time being "last night." He told the detectives that the incidents occurred in H.T.'s bedroom in the middle of the night and that he used the light on his cellphone to see.

{¶ 12} While appellant was in jail awaiting trial, he spoke to various members of his family over the telephone. These calls were recorded and the recordings were admitted into evidence at trial. During these phone calls, appellant stated he "f***** up" and "did something really bad." He admitted he "touched [H.T.] inappropriately" and that "she's not making anything up. It's not her fault."

{¶ 13} Following the state's presentation of its case-in-chief, appellant moved for acquittal pursuant to Crim.R. 29. The trial court denied appellant's motion, and appellant testified in his own defense. Appellant stated he "made a mistake" on April 21, 2016, and wanted to "own up to it." He admitted he touched H.T. inappropriately on that date when he "pulled her underwear to the side and there was contact. [He] put [his] finger behind her underpants." However, appellant denied penetrating H.T.'s vagina with his fingers on this occasion or on any other occasion. He also denied that he had a pocketknife in his possession on this occasion.

{¶ 14} Appellant claimed his statement to law enforcement that he touched H.T. "maybe once a week for the last couple months" was not accurate. Appellant testified there were only two other instances when he touched H.T., and, according to appellant, on both of those occasions the touching was accidental. Appellant explained that he once touched H.T. in the living room of their home when they were on the floor playing with the family dog. He testified:

> And H.T. came out of her room and she laid down on the floor
> with us. One thing that we did quite regularly was kind of play
> keep away with the ball with the dog. And she'd push at me and

> I'd push at her and whatnot. And I wasn't looking at her and I raised my arm out in front to push her out of the way and I stuck my hand between her legs. And I know that I touched her, you know, I touched her where I shouldn't have. But I mean it was – I wasn't looking, it was an accident.

The other incident occurred when appellant went into H.T.'s room to take off her glasses and turn off the television. According to appellant, "[H.T.'s] shirt was over to the side and one of her breasts was almost exposed." Appellant stated he "pulled her bra back over and pulled her shirt back over," but that was the extent of the touching.

{¶ 15} Appellant testified he never made any threats against H.T. concerning the inappropriate touching. He also denied that he threatened her not to tell others about the inappropriate touching.

{¶ 16} After hearing the forgoing testimony, Judge Gilb found appellant guilty of eight counts of sexual battery and seven counts of GSI. Judge Gilb ordered that a presentence investigation report ("PSI") be prepared and set the matter for sentencing. However, due to a family emergency for defense counsel and conflicts in Judge Gilb's schedule, appellant could not be sentenced by Judge Gilb prior to the expiration of his judicial term.[2] Therefore, on December 9, 2016, appellant was sentenced by Judge Donald E. Oda II.

{¶ 17} At the sentencing hearing, Judge Oda indicated he had reviewed the PSI, the exhibits introduced at trial, and "a legal pad which is about probably two-thirds of the way full with Judge Gilb's trial notes." Judge Oda heard a prepared statement from H.T. and heard from H.T.'s mother and the state. The state stipulated that the GSI and sexual battery convictions were allied offenses of similar import and it elected to proceed on the sexual battery offenses. The state recommended consecutive 36-month prison terms on each of the sexually battery convictions, for a total prison term of 24 years. After hearing the

---

2. In 2015, Judge Gilb was appointed by Governor John Kasich to fill a vacancy on the Warren County Court of Common Pleas. Judge Gilb's term ended in December 2016.

foregoing, Judge Oda classified appellant as a Tier III sex offender and imposed a 42-month prison sentence on each of the sexual battery counts. The prison terms were run consecutively, for a total prison term of 28 years.

{¶ 18} Appellant timely appealed, raising three assignments of error for our review.

{¶ 19} Assignment of Error No. 1:

{¶ 20} THE TRIAL COURT ERRED BY FINDING B.J.T. GUILTY OF SEXUAL BATTERY AND GROSS SEXUAL IMPOSITION BECAUSE THE VERDICTS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 21} In his first assignment of error, appellant argues his convictions for GSI and sexual battery were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 22} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 23} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177,

2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 24} Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19. *See also State v. Hart*, 12th Dist. Brown No. CA2011-03-008, 2012-Ohio-1896, ¶ 43 ("a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency").

### Sexual Battery

{¶ 25} Appellant was convicted of sexual battery in violation of R.C. 2907.03(A)(5), which provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." Sexual conduct includes "without privilege to do so, the insertion, however slight, of any part of the

body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

{¶ 26} Appellant argues the state failed to present evidence of penetration "beyond H.T.'s subjective testimony, and all other objective evidence points to the opposite conclusion." He contends that because the medical records from H.T.'s sexual assault examination did not show abnormalities or injuries, "the medical report lends credibility to [his] statements that no penetration occurred."

{¶ 27} However, after reviewing the record, weighing inferences and examining the credibility of the witnesses, we find that appellant's convictions for sexual battery are supported by sufficient evidence and are not against the manifest weight of the evidence. The state presented testimony and evidence proving all the essential elements of the offenses beyond a reasonable doubt. The state introduced testimony from H.T. that appellant engaged in sexual conduct by digitally penetrating her vagina in September, October, November, and December 2015, and in January, February, March, and April 2016. For all but the September 2015 offense, H.T. testified appellant entered her bedroom while she was sleeping and put his fingers into her vagina or touched her "inside her vagina." As for the September 2015 offense, H.T. explained appellant put his hands between her legs, inside her shorts and underwear, and put his fingers into her vagina while she was lying on the floor in the living room.

{¶ 28} Contrary to appellant's arguments, H.T.'s testimony is sufficient, on its own, to establish the element of penetration. "'There is nothing in the law that requires that a sexual assault victim's testimony be corroborated as a condition precedent to conviction.'" *State v. Robinson*, 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 41, quoting *State v. West*, 10th Dist. Franklin No. 06AP-111, 2006-Ohio-6259, ¶ 16. *See also State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, *6 (May 28, 1996)

(holding that "[e]ven without corroborating medical evidence, a victim's testimony that the perpetrator placed his penis in her vagina constitutes penetration"). Further, the medical report was not inconsistent with H.T.'s testimony. The fact that there were no injuries or abnormalities found during H.T.'s examination on April 21, 2016, does not mean that appellant did not penetrate H.T.'s vagina when he sexually assaulted her. It merely indicates that appellant's assault of the victim in the early morning hours of April 21, 2016, did not cause any lacerations or observable physical harm to H.T.'s vaginal area.

{¶ 29} Here, the trial court, as the trier of fact, "was in the best position to judge the credibility of witnesses and the weight to be given the evidence." *State v. Patterson*, 12th Dist. Butler No. CA2001-09-222, 2002-Ohio-5996, ¶ 12. The court was entitled to weigh H.T.'s testimony that appellant digitally penetrated her vagina against the version of events appellant testified to at trial. Though appellant denied ever penetrating H.T.'s vagina and testified that there were only three instances in which he inappropriately touched H.T., with two of those instances being accidental, appellant's April 21, 2016 statement to law enforcement indicated he had been intentionally touching H.T. inappropriately for "maybe once a week for the last couple months." Appellant's convictions are not against the manifest weight of the evidence simply because the trier of fact believed the testimony and evidence offered by the prosecution. *See State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17; *State v. Erickson*, 12th Dist. Warren No. CA2014-10-131, 2015-Ohio-2086, ¶ 42.

{¶ 30} Accordingly, given the evidence presented at trial, we find that appellant's convictions for sexual battery are supported by sufficient evidence and are not against the weight of the evidence.

### Gross Sexual Imposition

{¶ 31} Appellant was convicted of seven counts of GSI in violation of R.C.

2907.05(A)(5), which provides that

> [n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person * * * is substantially impaired because of a mental or physical condition or because of advanced age.

Sexual contact "means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, public region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "[S]leep is a 'mental or physical condition' sufficient to substantially impair a victim's ability to resist [or consent to] * * * sexual contact within the meaning of R.C. 2907.05(A)(5)." *State v. Porter*, 9th Dist. Medina No. 12CA0061-M, 2013-Ohio-3969, ¶ 19. *See also State v. Coran*, 2d Dist. Clark No. 2014-CA-17, 2014-Ohio-4406, ¶ 6, fn. 3.

{¶ 32} Appellant argues the state failed to prove the sexual arousal or gratification element of GSI, as the only evidence of sexual gratification offered by the state was H.T.'s mother's testimony that on one occasion, she woke up one night to find appellant masturbating beside her in bed. Appellant argues this testimony is "irrelevant and unrelated to [his] alleged conduct." Appellant argues that because H.T.'s mother's testimony is not linked to any specific date, "there is no evidence that this happened because of [his] actions concerning H.T."

{¶ 33} "While an essential element of the offense of gross sexual imposition is that the act is for the 'purpose of sexual arousal or gratification,' there is no requirement that there be direct testimony regarding sexual arousal or gratification." *State v. English*, 12th Dist. Butler No. CA2013-03-048, 2014-Ohio-441, ¶ 69. "Whether the touching was performed for the purpose of sexual arousal or gratification is a question of fact to be inferred from the type,

nature, and circumstances of the contact." *State v. Williams*, 12th Dist. Warren No. CA2012-08-080, 2013-Ohio-3410, ¶ 33. In making this determination, the trier of fact is "permitted to infer what the defendant's motivation was in making the physical contact with the victim." *Robinson*, 2015-Ohio-4533, ¶ 43. "If the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *State v. Pence*, 12th Dist. Warren No. CA2012-05-045, 2013-Ohio-1388, ¶ 78.

{¶ 34} Contrary to appellant's arguments, we find that his convictions for GSI are supported by sufficient evidence and are not against the manifest weight of the evidence as the state presented testimony and evidence proving beyond a reasonable doubt all the essential elements of GSI, including the sexual arousal or gratification element. In addition to H.T.'s mother's testimony that she once woke up in the middle of the night to appellant masturbating, the state introduced evidence that appellant repeatedly entered H.T.'s bedroom in the middle of the night while H.T. was alone and sleeping. Dressed only in his underwear, appellant would touch H.T.'s buttocks, chest, and vagina while using a cellphone to see what he was doing. After the first time appellant assaulted H.T., he told her she "better not tell anyone that it happened," and months later, after H.T. informed appellant that she was going disclose the abuse, he begged her to remain silent. Looking at appellant's behavior and the type, nature, and circumstances surrounding the sexual contact, we find that the finder of fact could properly infer that appellant's motivation in making physical contact with H.T.'s erogenous zones was sexual arousal or gratification. The finder of fact was entitled to conclude that there was no innocent or nonsexual explanation for appellant's conduct. *See State v. Goldblum*, 2d Dist. Montgomery No. 25851, 2014-Ohio-5068, ¶ 17; *State v. Wilson*, 192 Ohio App.3d 189, 2011-Ohio-155, ¶ 47 (11th Dist.).

{¶ 35} Accordingly, for the reasons stated above, we find that appellant's convictions

for GSI are supported by sufficient evidence and are not against the weight of the evidence. Appellant's first assignment of error is, therefore, overruled.

{¶ 36} Assignment of Error No. 2:

{¶ 37} THE TRIAL COURT ERRED AND IMPOSED A SENTENCE CLEARLY AND CONVINCINGLY CONTRARY TO LAW BECAUSE THE SENTENCING JUDGE CONSIDERED UNRELIABLE MATERIALS AT SENTENCING AND FAILED TO BECOME FAMILIAR WITH THE FACTS.

{¶ 38} In his second assignment of error, appellant contends that where the sentencing judge is different from the trial judge, it is improper for the sentencing judge to rely on the personal notes of the trial judge to inform himself of the facts of a case before imposing a sentence. Appellant argues Judge Oda's use of Judge Gilb's handwritten trial notes resulted in prejudicial error, as the notes contained Judge Gilb's private thoughts and characterizations, rather than a direct record of what was testified to at trial. Because the notes may contain "extraneous thoughts; statements that the note-taker later disregarded; misstatements of the record; half-formed ideas; or terms that have a different meaning to the note-taker than they might have to the note-reader," appellant argues that they are unreliable. Appellant believes Judge Oda should have read the trial transcript to familiarize himself with the evidence, and that doing so would have informed him of the inconsistences between the victim's and victim's mother's trial testimony and their statements at the sentencing hearing.

{¶ 39} Pursuant to Crim.R. 25(B), "[i]f for any reason the judge before whom the defendant has been tried is unable to perform the duties of the court after a verdict or finding of guilt, another judge designated by the administrative judge, or, in the case of a single-judge division, by the Chief Justice of the Supreme Court of Ohio, may perform those duties." If the newly designated judge "is satisfied that he cannot perform those duties because he

did not preside at the trial, he may in his discretion grant a new trial." *Id.*

**{¶ 40}** Generally, "a defendant who fails to timely object to the substitution of a judge waives his right to challenge the reassignment." *State v. Scurlock*, 6th Dist. Lucas No. L-15-1200, 2017-Ohio-1219, ¶ 57, citing *State v. Ross (In re Cirigliano)*, 105 Ohio St.3d 1223, 2004-Ohio-7352, ¶ 26. However, in the present case, appellant does not challenge Judge Oda's right to sentence him in accordance with Crim.R. 25(B). Rather, appellant challenges the manner in which Judge Oda sentenced him, arguing that Judge Oda should not have used or relied upon Judge Gilb's personal notes in imposing sentence. As appellant was informed at the sentencing hearing that Judge Oda had reviewed a "legal pad which is about probably two-thirds of the way full with Judge Gilb's trial notes," and appellant did not object to the court using this information in imposing his sentence, appellant has waived all but plain error on review. Plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights or influenced the outcome of the proceeding. Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002); *State v. Davis*, 12th Dist. Clinton No. CA2015-12-022, 2017-Ohio-495, ¶ 24.

**{¶ 41}** In support of his argument that his substantial rights were affected at sentencing, appellant relies on the Ninth Circuit Court of Appeals' decisions in *United States v. Jones*, 982 F.2d 380 (9th Cir.1992); and *United States v. Larios*, 640 F.2d 938 (9th Cir.1981). In these cases, the Ninth Circuit recognized that a defendant has a "due process right to have his sentence based on accurate information." *Jones* at 385. In *Jones*, the Ninth Circuit found reversible error where a sentencing judge who was different from the trial judge imposed a sentence on a defendant convicted of various drug-related offenses without properly familiarizing himself with the record. *Id.* The court noted that "the degree of familiarity necessary will vary with the nature of the case: 'the more the case depends on the credibility, and especially the demeanor, of the witnesses, the more a judge needs to do to

- 16 -

become adequately familiar with it.'" *Id.*, quoting *Larios*, 640 F.2d at 943. Here, the sentencing judge merely discussed the defendant's case with the trial judge and indicated that in imposing the sentence, he was acquiescing in the trial judge's view of the case. *Id.*

{¶ 42} In *Larios*, the Ninth Circuit found reversible error where a new sentencing judge refused to wait for a transcript of the trial to be prepared and, instead, relied on a report from a probation officer to familiarize himself with the case. *Larios* at 942-943. While recognizing that "[b]ecoming adequately familiar [with a case] does not always require the reading of a transcript, although a transcript will often be helpful, and sometimes essential," the Ninth Circuit determined that the sentencing judge lacked familiarity with the case, as evidenced by the factual findings that he made at sentencing hearing that were inconsistent with the evidence presented at trial. *Id.* at 943.

{¶ 43} The present case is similar to *Larios* and *Jones* in that Judge Oda did not review a transcript of the trial proceedings before sentencing appellant.[3] Rather, Judge Oda attempted to familiarize himself with the case by reviewing the PSI, the trial exhibits, and Judge Gilb's trial notes. We find the use of Judge Gilb's personal notes troubling. As the Ohio Supreme Court has recognized, "[a] trial judge's personal handwritten notes made during the course of a trial are not public records. * * * [S]uch notes are simply personal papers kept for the judge's own convenience and [are] not official records." *State ex rel. Steffen v. Kraft*, 67 Ohio St.3d 439, 439-440 (1993). As Judge Gilb's handwritten notes are not an official record of proceedings, the notes were not made part of the record on appeal. Like the parties below, we are left to speculate about the notes' content and accuracy.

{¶ 44} Appellant's substantial rights were affected by the sentencing judge's decision to utilize and rely on information that was not a part of the record and that is therefore not

---

3. The trial transcript was not prepared until January 2017, which was well after appellant was sentenced on December 9, 2016.

capable of being reviewed on appeal. "[T]he reliability and truthfulness of the information considered in sentencing remains a matter of fundamental concern." *Collins v. Buchkoe*, 493 F.2d 343, 345 (6th Cir.1974). *See also United States v. Jones*, 6th Cir. No. 00-0740, 2002 U.S. App. LEXIS 5958, *7 (Mar. 27, 2002) (noting that "[d]efendants have a due process right to a sentence based on accurate information"). The consideration of accurate and reliable information is critical to fulfilling the principles and purposes of felony sentencing. *See* R.C. 2929.11 and 2929.12. To impose a sentence that is reasonably calculated to both protect the public from future crime by the offender and to punish the offender, the sentencing court must consider reliable information about the offender's conduct and its impact on the victim. R.C. 2929.11(A) and (B). The court must also have accurate information regarding the seriousness of an offender's conduct. *See* R.C. 2929.12(B) and (C).

{¶ 45} Accordingly, under the facts presented in this case, where the sentencing judge relied on another judge's personal notes and impressions in attempting to familiarize himself with the case, rather than reviewing an official record of the proceedings, we conclude that there was error prejudicial to appellant's substantial rights relative to sentencing.

{¶ 46} Furthermore, inconsistencies between the trial testimony and the information relied upon by Judge Oda in sentencing appellant suggest that a review of the trial transcript was necessary. Judge Oda could not have known of the inconsistencies that existed in H.T.'s and H.T.'s mother's statements at sentencing, as compared to their trial testimonies, because he was not the judge who presided at appellant's trial. In determining the seriousness of appellant's conduct and the impact appellant's conduct had on the victim, Judge Oda did not have the chance to examine or weigh H.T.'s mother's claim at sentencing that appellant had been "threaten[ing] * * * [H.T.] with knives and constantly playing with guns around her" or both H.T. and H.T.'s mother's claims that appellant had threatened to kill H.T.,

H.T.'s mother, and H.T.'s brother if H.T. told anyone about the abuse against the testimony presented at trial. If Judge Oda had the opportunity to review the trial transcript, he would have discovered that the only knife discussed at trial was appellant's pocketknife and there had been no mention of guns or threats to kill H.T.'s family presented at trial. This information may have impacted appellant's sentence, as it is the sentencing judge that determines the weight afforded to any particular statutory factor, mitigating grounds, or other relevant circumstance. *See State v. Steger*, 12th Dist. Butler No. CA2016-03-059, 2016-Ohio-7908, ¶ 18. Judge Oda should have the opportunity to consider the inconsistencies that existed between the trial testimony and the statements made at sentencing in examining the seriousness of appellant's conduct and the impact appellant's conduct had on the victim before imposing a sentence that fulfills the principles and purposes of felony sentencing.

{¶ 47} Therefore, for the reasons stated above, we find that the trial court erred in imposing appellant's sentence. We sustain appellant's second assignment of error, reverse the sentence imposed by the trial court, and remand the matter for resentencing. On remand, the sentencing judge is instructed to familiarize himself with the case through the official records of the proceedings and by reviewing the trial transcript and is to sentence appellant in accordance with the principles and purposes of felony sentencing.

{¶ 48} Assignment of Error No. 3:

{¶ 49} THE TRIAL COURT ERRED AND IMPOSED A SENTENCE CLEARLY AND CONVINCINGLY CONTRARY TO LAW BECAUSE THE SENTENCE WAS IMPOSED CONSECUTIVELY RATHER THAN CONCURRENTLY, IS DISPROPORTIONATE TO THE CRIME COMMITTED, AND IS NOT SUPPORTED BY THE RECORD.

{¶ 50} In his third assignment of error, appellant argues the trial court erred when it sentenced him to an aggregate prison term of 28 years. Appellant contends the court should have imposed concurrent, rather than consecutive, prison terms and that the 42-month

prison term imposed on each of the sexual battery convictions was excessive and contrary to law. However, this assignment of error is moot given our resolution of appellant's second assignment of error. *See* App.R. 12(A)(1)(c); *State v. Magallanes*, 3d Dist. Putnam No. 12-14-02, 2014-Ohio-4878, ¶ 31.

{¶ 51} Judgment affirmed in part, reversed in part, and the cause remanded for resentencing consistent with this opinion.

PIPER and M. POWELL, JJ., concur.