**[Cite as *State v. Salmon*, 2026-Ohio-1896.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                                      Court of Appeals No. L-25-00112

      Appellee

                                        Trial Court No. CR0202401367

v.

Eric Salmon                                                      **DECISION AND JUDGMENT**

      Appellant                                             Decided: May 22, 2026

* * * * *

Julia R. Bates, Prosecuting Attorney and
Lorrie J. Rendle, Assistant Prosecuting Attorney, for appellee.

Nicole K. Papageorgiou,
Andrew R. Mayle and
Benjamin G. Padanilam, for appellant.

* * * * *

**ZMUDA, J.**

## I.      Introduction

{¶ 1} Appellant, Eric Salmon, appeals the May 5, 2025 judgment of the Lucas County Court of Common Pleas convicting him of one count of involuntary manslaughter and sentencing him to a minimum prison term of seven years and a maximum prison term of ten-and-a-half years. For the reasons that follow, the trial court's judgment is affirmed.

## Facts and Procedural History

{¶ 2} On March 11, 2024, appellant was indicted by a grand jury in the Lucas County Court of Common Pleas on one count of murder in violation of R.C. 2903.02(A) and 2941.145(A), an unspecified felony (count 1); one count of murder in violation of R.C. 2903.02(B), unspecified felony (count 2); and one count of felonious assault in violation of R.C. 2903.11(A)(2) and (D), a second-degree felony (count 3). All three counts included a three-year firearm specification pursuant to R.C. 2941.145(A).

{¶ 3} The charges stemmed from an incident on February 29, 2024 in Toledo, Ohio. Appellant owned a plumbing company where the victim worked as a plumber, and on the evening of February 29, 2024, appellant, the victim, and a few other employees, friends, and family members were gathered at the plumbing company to socialize after work hours. Many of these individuals, including appellant and the victim, were drinking alcohol throughout the night. The victim became intoxicated and was aggressive. At the end of the night, the victim started an altercation in the parking lot outside the plumbing company building, and shortly after that altercation was broken up, the victim aggressively approached appellant. In response, appellant shot the victim multiple times, killing him. The incident was recorded by appellant's security cameras.

### Plea Agreement & Hearing

{¶ 4} Appellant initially pled not guilty to the charges in the indictment, and he filed notice of his intent to claim self-defense at trial. On the morning trial was scheduled

2.

to begin, the parties entered into a plea agreement under which appellant agreed to enter a guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), to involuntary manslaughter in violation of R.C. 2903.04, and the State agreed to seek the dismissal of the charges in the indictment, including the firearm specifications. The trial court then held a plea hearing, engaging in a plea colloquy pursuant to Crim.R. 11. The State provided the following explanation of circumstances:

> [O]n or about February 29th 2024, … [appellant] was … at his place of business ….with family members and friends as well as the victim who worked for [appellant].

> They were drinking after hours at the place of employment having competitions with air rifles. The State would have shown as the evening wore on, a number of individuals became intoxicated, including [appellant] as well as the victim. Additionally, [appellant's] friend introduced a firearm to the situation causing the victim to become upset. At that time the victim had conversations – heated conversations with [appellant].

> Additionally, Judge, the State would have shown that the victim also had some physical confrontations with [appellant]. Ultimately, the State believed the evidence would have shown that at 11:12 p.m. that evening the parties were outside in the parking lot attempting to leave when the victim had an altercation with [appellant's] son.

> Once that was alleviated, [appellant] moved towards his car and the victim approached him after he had removed his shirt. At that time the State would have proven that [appellant] shot the victim 3 times at close range causing his death.

After accepting appellant's plea, the trial court found appellant guilty, ordered a presentence investigation (PSI), scheduled a sentencing hearing, and concluded by asking if either party had anything additional to raise. Both parties denied that they did.

### Sentencing Memorandum and Video

{¶ 5} Between the plea hearing and the sentencing hearing, appellant filed a sentencing memorandum with the trial court. In his memorandum, appellant alleged that in the recitation of facts at the plea hearing, the State "noted that the alleged victim attacked [appellant] multiple times during the night of the incident, and did not [include] any reason that would exclude the possibility of a self-defense claim by [appellant]." Appellant maintained that he acted in self-defense, which he contended was "relevant to his sentencing." In support of his allegation that he acted in self-defense, appellant argued that on the night in question, the victim "was carrying a knife or a box cutter and holding it during … confrontations" with the appellant and others present at the plumbing company. Appellant characterized the victim as "charging [appellant], essentially pinning him against his truck," leaving appellant no choice but to shoot the victim. Appellant also claimed that the victim had served in the military and had represented himself as having engaged in violent encounters during his time in the military, making appellant fear the victim.

{¶ 6} As an exhibit to the memorandum, appellant submitted several portions of the video recorded by his security cameras on the evening of February 29, 2024, including a video of the shooting. The video, which contains no audio, was recorded by a security camera pointing toward a parking area behind the plumbing company building. In the video, appellant's truck is seen parked very close to the building's door, just under the security camera. A sedan with its headlights on is parked just behind appellant's truck, a bit farther from the camera. At 11:10 p.m. according to the video's time stamp, two women, appellant, and the victim exit the building through the door. The two

4.

women walk away from the camera to a truck parked a short distance from the sedan. Appellant remains standing in the doorway of the building, holding open the door and talking to some men who are still in the building. The victim walks to the sedan and opens the driver's door.

{¶ 7} Before the victim gets into his vehicle, appellant turns to the victim and the two begin what appears to be a heated conversation. The victim then shuts the sedan's door and walks between the front of the sedan and the rear of appellant's truck toward appellant, who remains in the doorway holding open the door. The victim aggressively approaches appellant and pushes him twice. Appellant remains in the doorway and continues to argue with the victim while two other men come out of the building from behind appellant, one of whom guides the victim away from the building and toward the sedan. Appellant then goes back into the building, allowing the door to shut behind him.

{¶ 8} As the two men attempt to talk to the victim, he pushes and then swings at one of them. The two men then wrestle with the victim as they attempt to subdue him, ending up near the side of the sedan, as one of the women jumps out of the truck and runs over to assist the men in their efforts. Appellant comes back out of the building, stands near the door for a moment, then approaches the group, appearing to yell at the victim. The victim backs away from the two men and the woman and he goes behind the sedan, appearing agitated as he takes off his shirt and throws it. Appellant appears to talk to the victim for a short time and then begins walking toward his truck, which is parked just in front of the sedan.

5.

{¶ 9} After appellant crosses into the space between the two vehicles, he turns around to face the victim, and the victim begins walking aggressively toward appellant, passing the two men and the woman. Appellant backs up toward the rear driver's side of his truck, and the victim comes close to him, clearly agitated. Appellant points a gun at the victim, and the victim raises both hands into the air, both of which appear to be empty. Appellant, with the gun pointed at the victim, backs up into the space between the two vehicles, away from the victim and toward the building's door. As he does so, two muzzle flashes occur in quick succession and the victim falls to the ground, out of the camera's view. Appellant immediately approaches the victim and appears to stand over him for a moment before going back into the building.

{¶ 10} In total, the time from when the individuals began to exit the building to the shooting is approximately three minutes.

### *Sentencing Hearing*

{¶ 11} On April 24, 2025, appellant appeared before the trial court for sentencing. At the hearing's outset, the trial court noted that it had received many letters on behalf of both the victim and appellant as well as appellant's sentencing memorandum. The trial court then permitted appellant's counsel and appellant to speak regarding mitigation. Appellant's counsel requested that the court consider the sentencing memorandum and spoke specifically of fear being the cause of the victim's death. Appellant spoke on his own behalf, apologizing to the victim's family, characterizing the victim as his friend as well as his employee, and expressing remorse for his actions.

6.

{¶ 12} The State responded to appellant's sentencing memorandum by arguing that self-defense was not at issue because the trial court had found appellant guilty of involuntary manslaughter. The State also pointed out that appellant had employed the victim for two years, during which the victim worked closely with appellant's sons, appellant and the victim were drinking for most of the night, appellant engaged the victim as the victim was getting into his vehicle to leave, the victim did not have a weapon, and appellant fired five gunshots at close range.

{¶ 13} The court also made several statements about appellant's reliance on self-defense, as follows:

> So in your Sentencing Memorandum a lot of talk about self-defense and as the State indicated the issue of self-defense has come and gone because that was a matter of trial. But I will accept your Sentencing Memorandum as a means to articulate mitigation as to what happened. … And I can tell you I've reviewed all the evidence that was submitted to me by both sides. I've reviewed especially the videos. … At least seven times I've watched them. … I clicked in parts second by second to try to get a fuller understanding of what took place. And I'll tell you that even though I'm not here to decide self-defense, but because it impacts how I view … mitigation.…
>
> And one thing we can say and no offense to [the victim], but to put it mildly he was acting like [a] jerk that [n]ight and I'm not in any way saying he deserved the outcome but he was a handful. …. But in looking at the issue of self-defense even as a mitigating factor an individual's belief that he was in imminent danger must be objectively reasonable as well as him having an honest belief that it was reasonable.
>
> And a defendant can only use such force against the believed danger that is necessary to repel the attack. And shooting has been considered disproportionate force in response to being pushed by an individual even if that individual is bigger and stronger than the shooter. And so that's something that the law requires that I bear in mind.…

7.

And so I've watched repeatedly the interaction in the office with all the individuals that were present …. I never felt that anyone other than [the victim], who was clearly intoxicated, was particularly upset or disturbed by [the victim's] conduct….

And even when he is outside and even when he's wrestling with the others before he comes up to [appellant], pushes him a couple times rather violently, gives him what I perceive to be a jab in the ribs, [appellant] didn't seem overly whipped up about that.

[The victim] separates. [Appellant] separates. [The victim] comes back. The two approach by the car. [The victim's] shirt has been stripped off. [Appellant] points a gun to him – at him and [the victim] spreads his arms out in a fashion that I almost perceived him saying if not at least thinking, oh, really you're going to shoot me? My friend my employer, you're going to shoot me?

And [appellant] takes actually a step backwards and putting more distance between himself and [the victim] and does just that; two shots in rapid succession. [The victim] falls to the ground, disappears from the camera's view and [appellant] then approaches and fires more shots while he's down.

And so the law says that using excessive force when someone is no longer a threat is so disproportionate that it shows a purpose to injure and that self-defense is not available. So all that, I'm expressing to say that if I were the finder of fact, I would not have concluded that [appellant] acted in the strict legal sense of self-defense.

But certainly looking at the entirety of what happened, I find that there are factors that mitigate what the maximum sentence could be and I look at the Presentence Report. He has no prior felonies. He's been a family man, a working man, tax paying individual. I don't think that [appellant] was in fear. I think he just actually was fed up with [the victim's] conduct. If he didn't have that gun, he would have wrestled [the victim] into his car and he would have gone home to sleep it all off. But that's not what took place.

{¶ 14} After stating that it had considered the factors in R.C. 2929.11 and 2929.12, the trial court sentenced appellant to a prison term of a minimum of seven years and a maximum of ten-and-a-half years. After imposing appellant's sentence, the trial court

8.

asked if there was anything from the defense and the State, and both parties denied that there was. The trial court then dismissed the remaining charges in the indictment.

{¶ 15} On May 5, 2025, the court issued a judgment entry reflecting its findings and the sentence imposed at the sentencing hearing.

### *Motion to Withdraw Plea*

{¶ 16} Approximately six weeks after the sentencing hearing, appellant filed a motion to withdraw his plea pursuant to Civ.R. 32.1 based in part on what he characterized as false statements made by the trial court during sentencing. Appellant also filed a notice of appeal with this court, which was stayed pending the outcome of his motion to withdraw his plea.

{¶ 17} In support of his motion to withdraw his plea, appellant claimed in part that the trial court made inaccurate statements during the sentencing hearing. Specifically, appellant alleged the trial court inaccurately "described the delivery of a coup de grace by [appellant] as the victim lay on the ground after being initially shot." The State filed a response in opposition to appellant's motion, pointing out that appellant "had the ability to counter the Court's impression [of the video] on the date of sentencing."

{¶ 18} The trial court held a hearing on appellant's motion to withdraw his plea on July 8, 2025. Appellant began by stating that he intended to call the coroner to testify in an attempt to dispute the trial court's statements at sentencing, which he characterized as concluding that appellant "stood over the deceased … and shot him while he was on the

9.

ground." Appellant maintained that the coroner would testify that the victim had three gunshot wounds and that all three wounds were sustained while the victim was standing.

{¶ 19} In response, the trial court clarified that its statements at sentencing did not amount to a conclusion that appellant actually shot the victim after he was down, as follows:

> THE COURT: [A]s I'm recounting what I observed on the video, I say at line 11, [appellant] takes actually a step backwards and putting more distance between himself and [the victim] and does just that, two shots in rapid succession. [The victim] falls to the ground, …disappears from the camera's view and [appellant] then approaches and fires more shots while he's down.
>
> I did not say that any of those shots struck him. There was, I think, a concurrence and I don't think I reference anything different, that there were five shots fired and three struck the victim.
> …
> So I will accept without the need for testimony if the parties agree, that if your point in calling the Coroner is that all the shots were fired while he was standing upright….
> …
> [Appellant] interpreted statements that this – myself, sentencing Judge made as alluding to that the victim was shot while being prone on the ground. But I don't see where I said that. I said he fires more shots while he was down. He wants to argue that all the shots were fired while he was standing upright. We'll see how much it matters whether he was upright or down at the time.
>
> That was my interpretation of the video that some of which was proffered by Defense, some of which offered by the State. There was nothing said at the time of sentencing [when] I made that statement to challenge the Court or correct the Court or make any issue of that at the time of sentencing. But I'll – I'm willing to accept that the evidence would show that the 3 projectiles in the victim's body all happened while the victim was essentially upright. Does that satisfy your needs, Counsel?
>
> [APPELLANT'S COUNSEL]: It would.

10.

{¶ 20} Following the hearing, the trial court denied appellant's motion to withdraw his plea. After the trial court issued its order denying appellant's motion to withdraw his plea, appellant's appeal with this court was reinstated.

## II. Assignment of Error

{¶ 21} On appeal, appellant asserts the following assignments of error for our review:

1. Appellant Eric Salmon's prison sentence is contrary to law because the trial court erroneously provided and relied upon inaccurate information as a basis for sentencing in violation of Salmon's due process rights.

2. Salmon's sentence is contrary to law because the trial court erroneously offered and relied upon an inaccurate recitation of the facts *without* allowing Salmon the opportunity to respond before rendering its sentence in violation of Salmon's right to allocution.

## III. Law and Analysis

{¶ 22} Our review of a felony sentence is governed by R.C. 2953.08(G)(2), which provides that to "increase, reduce, or otherwise modify a sentence," an appellate court must "clearly and convincingly find either …that the record does not support the sentencing court's findings" or "the sentence is otherwise contrary to law." *See State v. Jones*, 2020-Ohio-6729, ¶ 31-32. "[O]therwise contrary to law" means " 'in violation of statute or legal regulations at a given time.' " *State v. Bryant*, 2022-Ohio-1878, ¶ 22, quoting *Jones* at ¶ 34, quoting Black's Law Dictionary 328 (6th Ed.1990). "It is appellant's burden to identify clear and convincing evidence in the record to show that the trial court erred in imposing their sentence." *State v. Anderson*, 2025-Ohio-5732, ¶ 8 (6th Dist.), citing *State v. Walker*, 2021-Ohio-3860 (6th Dist.). The Ohio Supreme Court

11.

defined clear and convincing as "a degree of proof that is greater than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard used in criminal cases." *State v. Glover*, 2024-Ohio-5195, ¶ 46, citing *State v. Gwynne*, 2023-Ohio-3851, ¶ 14. It "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 23} Here, both of appellant's assignments of error contend that his sentence was contrary to law. Accordingly, we must determine whether appellant has presented clear and convincing evidence that his sentence violated a statute or legal regulation.

**A. Due Process**

{¶ 24} In his first assignment of error, appellant claims his sentence is contrary to law because his due process rights were violated. Appellant contends that the trial court sentenced him based on inaccurate information, and he maintains that the Due Process Clause gives him the right to be sentenced based on accurate information. In support, appellant points to two Ohio appellate cases in which the sentencing judge relied on information outside the record in imposing sentence, *State v. Fowler*, 2022-Ohio-3499 (6th Dist.) and *State v. B.J.T.*, 2017-Ohio-8797 (12th Dist.). In *Fowler*, the sentencing judge relied on his wife's observations about the accident that was the basis for the offenses, information that was not part of the record. *Id*. at ¶ 9. In vacating the sentence, this court explained that the sentencing court violated R.C. 2929.19(B)(1)(a), which provides that a sentencing court must only consider information contained in the record, thus rendering Fowler's sentence contrary to law. *Id*. at ¶ 15. Fowler did not raise due

process in his appeal, and this court did not consider whether Fowler's due process rights had been violated. *Id*.

{¶ 25} Due process was discussed in *B.J.T.* In that case, the sentencing judge relied on a different judge's personal notes about the case, information outside the record. *B.J.T.* at ¶ 43. The Twelfth District pointed out that because the personal notes were not part of the record, the appellate court was "left to speculate about the notes' content and accuracy." *Id*. Quoting the Sixth Circuit's statement that "[d]efendants have a due process right to a sentence based on accurate information," the Twelfth District concluded that the "[a]ppellant's substantial rights were affected by the sentencing judge's decision to utilize and rely on information that was not a part of the record and that is therefore not capable of being reviewed on appeal." *Id*. at ¶ 44, quoting *United States v. Jones*, 40 Fed.Appx. 15, 17 (6th Cir. 2002). Accordingly, the Twelfth District's decision was predicated on its inability to review the personal notes for accuracy and reliability.

{¶ 26} Indeed, as explained by the Sixth Circuit in *United States v. Jones*, to constitute a due process violation, the trial court must rely on information that is materially false or unreliable and without even minimal indicia of reliability:

> To demonstrate a due process violation "the defendant must establish that the challenged evidence is materially false or unreliable, and that such false or unreliable information actually served as the basis for the sentence." *United States v. Silverman*, 976 F.2d 1502, 1512 (6th Cir.1992) (emphasis deleted) (quoting *United States v. Robinson*, 898 F.2d 1111, 1116 (6th Cir.1990)). The evidence a sentencing court relies upon need only possess "some minimal indicia of reliability." *Robinson*, 898 F.2d at 1115.

13.

*Jones*, 40 Fed.Appx. at 17. In *Jones*, the sentencing court pointed to Jones's involvement in several murders "either directly or with people who were part of his organization," conduct that was not part of the offense at issue, in imposing sentence. *Id*. at 16. Jones argued on appeal that the trial court's statements about his involvement in murders were based on misinformation and therefore his due process rights had been violated. *Id*. at 17. The Sixth Circuit affirmed the sentence, explaining that the sentencing judge had presided over numerous trials involving Jones's organization, Jones "did not deny his culpability as the head of the organization that was responsible for murder," and therefore his claim that he was "sentenced on the basis of incorrect information [was] wholly unsupported by the record." *Id*. at 18.

{¶ 27} Here, unlike the appellants in *Fowler* and *B.J.T.*, appellant does not argue—nor can he—that the sentencing judge considered information outside the record. Appellant himself provided the video to the trial court expressly for the court to consider in imposing sentence. Instead, appellant now asserts that the trial court inaccurately summarized the events in the video when it described when and how he shot the victim. Appellant maintains that at his sentencing hearing, the trial court concluded that appellant "fired more shots into the victim after he fell when assessing mitigation." In other words, appellant asserts that the trial court inaccurately concluded that appellant continued to shoot the victim after he had fallen, and the trial court used that conclusion to weigh against mitigation. To demonstrate that the trial court made inaccurate statements, appellant points to what he characterizes as the trial court's "correction" of those statements at the July hearing on appellant's motion to withdraw his plea when the court

14.

stated that it would accept that the victim sustained all three gunshots while he was still upright. In his merit brief, appellant does not allege there are any other inaccuracies in the trial court's statements at sentencing.

{¶ 28} Our review of the video demonstrates that the trial court's statements about the video are either objectively accurate or a plausible interpretation of unclear events. It is undisputed that appellant fired five gunshots and three of those shots hit the victim, meaning that two shots did not hit the victim. At sentencing, the trial court stated, "[appellant] takes actually a step backwards and putting more distance between himself and [the victim] and does just that; two shots in rapid succession. [The victim] falls to the ground, disappears from the camera's view and [appellant] then approaches and fires more shots while he's down." The video shows appellant pointing a gun at appellant followed by two muzzle flashes. After the two muzzle flashes, the victim falls to the ground, disappearing from the camera view, and appellant quickly approaches and stands over the victim, also mostly out of the camera view. Therefore, a plausible interpretation of the video is that two of the five total gunshots—those that did not strike the victim— were fired after the victim fell out of camera view.

{¶ 29} Moreover, the trial court's statements at the April sentencing hearing are entirely consistent with the court's later statement at the July hearing. It is undisputed that appellant fired five shots and the victim sustained three gunshot wounds, meaning that two of appellant's shots did not strike the victim. The trial court's statement at the July hearing that he accepted that all three shots were fired while the victim was

15.

"essentially upright" does not preclude the possibility that two shots were fired after the victim fell, consistent with the trial court's statements at the April sentencing hearing.

{¶ 30} Notably, there were no evidentiary findings made by a factfinder in this case regarding self-defense due to appellant's decision to enter an *Alford* plea prior to trial. *See State v. Schmidt*, 2010-Ohio-4809, ¶ 13 (3rd Dist.) (explaining that "[a]n *Alford* plea has the same legal effect as a guilty plea"). As to self-defense as mitigation, a trial court is not required to provide any explanation to support its weighing of the factors in R.C. 2929.11 and 2929.12, which includes mitigation. *State v. Henley*, 2023-Ohio-396, ¶ 10 (6th Dist.). Here, the trial court nonetheless provided a lengthy explanation of how it considered information in the record to determine that self-defense was not a mitigating factor. Appellant had the opportunity to argue self-defense as mitigation both in his sentencing memorandum, which the court expressly considered during the sentencing hearing, and in his and his counsel's statements during the sentencing hearing itself. His disagreement with the trial court's conclusions does not make them inaccurate. Furthermore, "R.C. 2953.08(G)(2) does not permit an 'appellate court to independently weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12.' " *State v. Bowles*, 2021-Ohio-4401, ¶ 7 (6th Dist.), quoting *State v. Jones*, 2020-Ohio-6729, ¶ 42.

{¶ 31} Appellant has not sustained his burden to point to clear and convincing evidence that the trial court relied on information outside the record or information that was "materially false" or "without any indicia of reliability." Accordingly, we cannot

clearly and convincingly find that his due process rights were violated and his sentence is contrary to law.

{¶ 32} Appellant's first assignment of error is not well-taken.

## B. Right to Allocution

{¶ 33} In his second assignment of error, appellant contends that his sentence is contrary to law because his right to allocution was violated. He argues that the trial court's statements about the video introduced "new information" to which he was entitled to respond before the trial court imposed sentence.

{¶ 34} Crim.R. 32(A)(1), consistent with the right of allocution, provides that "at the time of imposing sentence," the court shall "[a]fford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." "Inherent in the right of allocution is 'the opportunity for the defendant to address the court directly on his own behalf *after* all the information on which the sentencing court relies when pronouncing sentence has been presented.'" *Fowler*, 2022-Ohio-3499 at ¶ 16, quoting *State v. Brown*, 2006-Ohio-1796, ¶ 13 (11th Dist.) (Emphasis in original.). Accordingly, "[a] trial court can violate a defendant's right of allocution if it does not allow the defendant to respond after new information is introduced and considered by the court at the sentencing hearing. *Id*. at ¶ 17, citing *State v. Yates*, 2011-Ohio-3619, ¶ 21 (2d Dist.).

{¶ 35} In *Fowler*, this court determined that the trial court's statements about information outside the record—his wife's observations of the accident—was new

17.

information to which the appellant was entitled to respond before the trial court imposed sentence. *Id*. at ¶ 18. Notably, in *Fowler*, the error identified by this court was not that the trial court made inaccurate conclusions about his wife's observations, but that Fowler had no knowledge of those observations at the time that Fowler had the opportunity to speak. *Id*.

{¶ 36} Here, appellant claims that the trial court's statements interpreting the video constituted new information to which he was entitled to respond. Because appellant had the opportunity to speak before the trial court made those statements and not again until after the court imposed sentence, appellant concludes that his right to allocution was violated.

{¶ 37} Unlike in *Fowler*, however, the trial court's statements in this case concerned information wholly within the record—the videos submitted by appellant for the court's consideration in imposing sentence—and not information outside the record. *Id*. Appellant contends that the trial court's statements regarding the videos were inaccurate and those inaccurate statements constitute "new information" to which he was entitled to respond before the trial court imposed sentence. However, as previously discussed, the trial court's statements were not inaccurate, nor did they introduce information outside the record. They were plausible interpretations of material submitted by appellant himself. Moreover, the record demonstrates that appellant, through his sentencing memorandum and in his own statements and the statements of his counsel, had the opportunity to present his own interpretation of the events in the video and argue self-defense as mitigation, and the trial court's statements were made in direct response to 18.

those arguments regarding the very same video. The right to allocution does not give appellant the right to counter every single statement made by the trial court with which he disagrees. *See State v. Short*, 2011-Ohio-3641, ¶ 85 ("[T]he right to 'present any information in mitigation' does not imply a right to an evidentiary hearing."). Accordingly, appellant's right to allocution was not violated.

{¶ 38} Because we cannot clearly and convincingly find that appellant's right to allocution was violated, appellant's second assignment of error is not well-taken.

### IV.    Conclusion

{¶ 39} Appellant's assignments of error are found not well-taken. We affirm the May 5, 2025 judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.
_____
JUDGE

Charles E. Sulek, J.
_____
JUDGE

Donna J. Carr, V.J.[1]
CONCUR.
_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

---

[1] Sitting by assignment of the Chief Justice of the Supreme Court

19.

20.