[Cite as *State v. Woodard*, 2022-Ohio-3081.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29110 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-471 |
| | : | |
| JUSTUS WOODARD | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of September, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384 and LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorneys, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorneys for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, 101 Southmoor Circle NW, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Justus Woodard, appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of single counts of felonious assault, abduction, and domestic violence. In support of his appeal, Woodard contends that the trial court violated his constitutional and statutory rights to a speedy trial. Woodard also contends that the trial court erred by not merging the felonious assault and abduction offenses at sentencing and by failing to instruct the jury on aggravated assault as an inferior-degree offense to felonious assault. Woodard further contends that he was prejudiced by multiple procedural irregularities that took place during his trial and sentencing, and he also raises several claims of ineffective assistance of counsel. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On February 19, 2020, a Montgomery County grand jury returned an indictment charging Woodard with one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree; one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree; and one count of domestic violence in violation of R.C. 2919.25(A), a felony of the fourth degree. The charges stemmed from allegations that, during the early morning hours of February 9, 2020, Woodard went to his estranged wife's home in Miamisburg, Ohio, and became angry after seeing messages from other men on her cell phone. It was alleged that, after seeing the messages,

Woodard pushed his wife down on her bed multiple times and then choked her until she lost consciousness.

{¶ 3} Following Woodard's indictment, the trial court issued a warrant for Woodard's arrest. On March 3, 2020, Woodard was arrested by law enforcement officers in Florida. Woodard was then extradited to Ohio on March 19, 2020, and booked into the Montgomery County Jail.

{¶ 4} On April 22, 2020, the trial court scheduled Woodard's case for a jury trial to commence on August 5, 2020. In doing so, the trial court issued an order extending Woodard's speedy-trial deadline from June 13, 2020, to August 5, 2020. The extension was made in response to COVID-19 concerns, as the trial court's order referenced the passage of Am.Sub.H.B. No. 197 and the Administrative Order of the Supreme Court of Ohio, which tolled speedy-trial deadlines from March 9, 2020 to July 30, 2020, as a result of the COVID-19 pandemic.

{¶ 5} After the trial court ordered the speedy-trial extension, Woodard filed a time waiver on July 21, 2020, that waived his constitutional and statutory rights to a speedy trial. Shortly thereafter, the trial court rescheduled Woodard's jury trial for December 16, 2020. Two weeks prior to trial, Woodard and his counsel requested new counsel be appointed to represent Woodard due to the deterioration of their attorney-client relationship. In response, the trial court appointed new counsel for Woodard and continued his jury trial to March 3, 2021.

{¶ 6} The first day of Woodard's jury trial was presided over by Judge Mary Wiseman. However, on the second day of trial, Judge Richard Skelton appeared as the

presiding judge. Judge Skelton explained on the record that Judge Wiseman had been exposed to someone who had tested positive for COVID-19, which, pursuant to health department guidelines, required her to be in isolation for 10 days. Judge Skelton advised that he had offered to cover the trial but wanted to first ask the jurors whether they had any concerns about moving forward with the trial. After considering the matter, the jurors indicated that they were comfortable with the trial going forward as scheduled. The parties also indicated that they had no concerns with the trial moving forward or with Judge Skelton replacing Judge Wiseman. As a result, Judge Skelton presided over the rest of Woodard's jury trial.

{¶ 7} During trial, the State called several witnesses to testify. Among the witnesses was the purported victim of Woodard's offenses—Woodard's wife, J.W. J.W. testified that she and Woodard had been married since July 2, 2016, but had been separated since December 15, 2019. With regard to the incident in question, J.W. testified that around 3 a.m. on February 9, 2020, she awoke to Woodard knocking on her bedroom window. J.W. testified that she went to the back door of her house and saw Woodard standing outside crying. Upon seeing this, J.W. thought that Woodard wanted to reconcile their marriage. J.W. testified that she let Woodard inside her residence and engaged in consensual sex with him. J.W. claimed that Woodard never placed his hands around her neck while they were having consensual sex.

{¶ 8} Continuing, J.W. testified that after she and Woodard had sex, her cell phone alerted to a Facebook message from Woodard's former boss, Tim Stansell. J.W. testified that Woodard grabbed her cell phone, saw the message, and began screaming

at her and accusing her of sleeping with Stansell. Thereafter, J.W. recalled Woodard ordering her to get on the bed and not get up. J.W. testified that she tried to get up from the bed four or five times, but that every time she did so, Woodard would use his arm to push or hit her back down on the bed and tell her to "sit the fuck down." Trial Tr. Vol. I (March 3, 2021), p. 44. J.W. also testified that Woodard threatened to tie her to the bed and to kill her, her mother, and her dog.

{¶ 9} J.W. testified that, after Woodard made these threats, he began searching through her cell phone. In doing so, Woodard discovered a different message from one of his co-workers, Jeremy, which, according to J.W., "set [Woodard] off." *Id.* at 45. J.W. testified that Woodard accused her of sleeping with Jeremy and threw her phone against the bathroom wall. J.W. testified that Woodard then sat on her stomach with his legs straddled around her while she was lying on her back on the bed. J.W. then recalled Woodard whispering: "[T]here's no cameras here to show what's * * * happening to you." *Id.* at 46. The next thing J.W. remembered was Woodard putting both of his hands around her neck and her not being able to breathe. J.W. testified that she blacked out and eventually woke up on the floor to Woodard performing CPR on her.

{¶ 10} Once she regained consciousness, J.W. went to the bathroom to get her cell phone to see if she could call the police. J.W. testified, however, that Woodard jerked her phone out of her hand, threw it in the toilet, and said "you're not calling nobody bitch." *Id.* at 48. J.W. testified that she then attempted to leave her house but ultimately stayed because Woodard threatened to burn it down if she left. J.W. also recalled Woodard begging her to not contact the police for 48 hours so that he could have time to

run.    J.W. testified that just before Woodard left her house that morning, he looked at her and said: "[I]f I have to do any prison time over this, bitch, I will be back to kill you and your family."    *Id.* at 50.

{¶ 11} J.W. testified that after Woodard left her house, she drove to a friend's house to call the police.    J.W.'s friend and the responding police officer appeared at trial and testified regarding J.W.'s emotional state and the visible injuries they observed to J.W.'s neck and chest.    The attending physician who examined J.W. following the incident also testified regarding J.W.'s injuries.    Specifically, the physician testified that J.W. had bruising on her right lateral and left lateral neck and small cuts to her fingers.  The State also admitted photographs into evidence that depicted bruising on J.W.'s neck, chest, face and arms.    *See* State's Exhibit 14-24.

{¶ 12} After the State rested its case, Woodard testified in his defense.    During his testimony, Woodard admitted that he went to J.W.'s residence on the night in question after drinking two pitchers of beer.    Woodard claimed that he just wanted to sleep on J.W.'s couch, but that J.W. wanted to first talk about their relationship.    Woodard testified that J.W. told him that she was aware he had a new girlfriend and that she wanted to know if he would come back to her and reconcile their marriage.    Woodard testified that he answered no and told J.W. that she needed to move on without him.    Woodard, however, claimed that J.W. did not want to move on and told him that God wanted them to be together.    In response, Woodard testified that he told J.W. he wanted a divorce.

{¶ 13} After having this conversation, Woodard claimed that J.W. wanted him to go to her bedroom so that they could have sex.    Woodard testified that he did not want

to have sex with J.W., but that he went to the doorway of J.W.'s bedroom anyway. During that time, Woodard claimed that J.W. rubbed her hand on the bed and said "it sure is lonely over here." Trial Tr. Vol. II (Mar. 5, 2021), p. 308. Woodard testified that he was adamant about not having sex with J.W. and turned around to leave; however, Woodard testified that J.W. followed him, took ahold of his shirt, and pulled him down on the couch while saying "please don't go, please don't go." Id. at 309. Woodard testified that J.W. continued to tell him that God told her that they were going to be together and that if he was going to divorce her "the least [he] could do is have sex with [her] one last time." Id. at 310. Woodard testified that J.W.'s reasoning made perfect sense in his drunk state of mind and that he engaged in consensual sex with J.W.

{¶ 14} Woodard further testified that while having sex, J.W. "grabbed [his] hand and put it on her neck" because "she likes to be choked." Id. at 311. Woodard testified that he "was mad that [J.W.] somehow talked [him] into having sex with her[.]" Id. Despite this, Woodard testified that he and J.W. "ended up having sex again." Id. at 312. When they had sex a second time, Woodard testified that J.W. "place[d] [his] hands on her neck again" and "put[ ] her hands around [his hands] and then squeeze[d] * * * tighter than [they've] ever done it before." Id. at 312-313.

{¶ 15} Woodard testified that when he and J.W. were finished having sex, J.W. laid her cell phone next to him on the bed; the cell phone alerted to a message 15 minutes later. Woodard testified that J.W asked him to hand her the phone and that when he did, he noticed the message was from his former boss, Stansell. Woodard testified that when he saw the message he became infuriated because he believed that J.W. had been

having an affair. Woodard testified that he messaged back and forth with Stansell on J.W.'s phone while he was upset.

**{¶ 16}** After messaging Stansell, Woodard testified that J.W. received another message on her cell phone from a different person. Woodard testified that the message said: "[W]hen I say that I love you, you know I mean it, right[?]" Trial Tr. Vol. II (Mar. 5, 2021), p. 317. Woodard testified that he became very upset after seeing this message and angrily threw J.W.'s table lamp into a mirror. Woodard also admitted to putting his hands on J.W.'s "upper shoulder * * * to hold her down" while asking her who the message was from. *Id.* Woodard testified that J.W. told him the message was from a man named Jeremy. Woodard testified that the Jeremy in question was his best friend and coworker, but that J.W. insisted it was a different person.

**{¶ 17}** Thereafter, Woodard testified that he threw J.W.'s cell phone into the bathroom, which caused the phone to break. Woodard testified that J.W. began crying because she claimed that she could not afford another phone. Woodard recalled that J.W. was "crying heavily to where she couldn't possibly * * * talk at the same time" and noted that "it's hard for [J.W.] to catch her breath at the same time when she cries." *Id.* at 319-320. Woodard testified that he felt bad about breaking J.W.'s phone because J.W. had just told him that she had lost her job. As a result, Woodard claimed that he began consoling J.W. and held her in his arms while she was sitting on the edge of the bed crying.

**{¶ 18}** Woodard testified that while he was holding J.W., J.W.'s "body kind of went limp a little bit" and "leaned to the left." *Id.* at 321. Woodard testified that J.W. then

"dove" towards the floor. *Id.* Woodard testified that he was able to catch J.W. before she fell all the way to the floor and that J.W. did not respond when he asked her what she was doing. Although Woodard believed that J.W. was putting on a "façade," Woodard testified that he attempted to administer CPR on J.W. *Id.* at 324. Woodard testified that after giving J.W. five chest compressions and blowing into her mouth, J.W. "cough[ed] up air like it choked her or something." *Id.* at 324.

{¶ 19} Woodard testified that, shortly thereafter, J.W. sat back up on the bed and once again asked him to reconcile their marriage. Woodard testified that he and J.W. continued talking with each other until he left J.W.'s house at 7 a.m. During that time, Woodard testified that J.W. told him she would not press charges against him if he would reconcile with her. Woodard testified that he then grabbed his cell phone and tried to video record their conversation. The video was admitted into evidence, but it showed nothing more than J.W. staring at Woodard in her bedroom doorway and Woodard talking to the camera. The audio accompanying the video was not played for the jury. Woodard testified that after taking the video, J.W. told him that she was going to tell her brother that Woodard had choked her and that she was going to ruin his life.

{¶ 20} After the foregoing testimony and evidence was presented at trial, the jury deliberated and found Woodard guilty as charged in the indictment. Following the guilty verdict, Woodard's trial counsel moved to withdraw his representation of Woodard due to the deterioration of their attorney-client relationship. The trial court granted counsel's motion and appointed new defense counsel to represent Woodard for the limited purpose of sentencing and possibly filing an appeal.

{¶ 21} On April 27, 2021, Judge Wiseman returned to preside over Woodard's sentencing hearing. While sentencing Woodard, Judge Wiseman merged Woodard's felonious assault and domestic violence offenses as allied offenses of similar import. Judge Wiseman declined, however, to merge Woodard's abduction offense with the felonious assault. The State then elected to have Woodard sentenced for felonious assault, for which Judge Wiseman imposed an indefinite term of 8 to 12 years in prison. For the abduction offense, Judge Wiseman imposed 36 months in prison and ordered that term to be served consecutively to the indefinite term for felonious assault. Woodard therefore received an aggregate, indefinite term of 11 to 15 years in prison.

{¶ 22} Woodard now appeals from his conviction, raising five assignments of error for review. For purposes of clarity, we will review Woodard's assignments of error out of order.

**Fifth Assignment of Error**

{¶ 23} Under his fifth assignment of error, Woodard contends that his constitutional and statutory rights to a speedy trial were violated because the trial court did not bring him to trial within the time frame set forth in R.C. 2945.71. We disagree.

{¶ 24} The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by Section 10, Article I of the Ohio Constitution. *State v. Taylor*, 2d Dist. Greene No. 2021-CA-2, 2021-Ohio-2701, ¶ 7, citing *State v. Lackey*, 2015-Ohio-5492, 55 N.E.3d 613, ¶ 21 (2d Dist.), citing *State v. Adams*, 43 Ohio St.3d 67, 68, 538 N.E.2d 1025 (1989). The right to a speedy trial is also statutorily enforced in

Ohio by the provisions of R.C. 2945.71 et seq. *Lackey* at ¶ 21, citing *Adams* at 68. For a violation of the rights those statutory provisions confer, a defendant may seek a discharge from criminal liability pursuant to R.C. 2945.73. *State v. Kerby*, 162 Ohio App.3d 353, 2005-Ohio-3734, 833 N.E.2d 757, ¶ 18.

{¶ 25} The rights under R.C. 2945.71 include a felony defendant's right to be brought to trial within 270 days after being arrested. R.C. 2945.71(C)(2). Each day the defendant is held in jail in lieu of bail on the pending charge is counted as three days. R.C. 2945.71(E). Therefore, if a felony defendant is held in jail the entire time preceding trial, the time for bringing the defendant to trial is reduced to 90 days. *State v. Voris*, 2d Dist. Miami No. 2021-CA-2, 2022-Ohio-152, ¶ 26, citing *State v. Dankworth*, 172 Ohio App.3d 159, 2007-Ohio-2588, 873 N.E.2d 902, ¶ 31 (2d Dist.).

{¶ 26} The aforementioned time limitations for bringing a felony defendant to trial may be extended or "tolled" for the reasons listed in R.C. 2945.72. *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, 853 N.E.2d 283, ¶ 8. As relevant to this case, those reasons include:

(A)    Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against him, within or outside the state, by reason of his confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure his availability;

*  *  *

(G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court competent to issue such order[.]

R.C. 2945.72(A) and (G).

{¶ 27} In this case, the record establishes that Woodard was arrested in Florida on March 3, 2020, and was confined there until he was extradited to Ohio on March 19, 2020. Therefore, the tolling provision under R.C. 2945.72(A) applies to the period of time he was confined in Florida. In other words, no speedy-trial time elapsed prior to Woodard's returning to Ohio on March 19, 2020.

{¶ 28} The tolling provision under R.C. 2945.72(G) also applies to this case due to the March 27, 2020 passage of Am.Sub.H.B. No. 197 in response to the COVID-19 pandemic. This legislation tolled, retroactively to March 9, 2020, all statutorily established statutes of limitations, time limitations, and deadlines in the Ohio Revised Code and Administrative Code until the expiration of Executive Order 2020-01D or until July 30, 2020, whichever came first. In addition, the Supreme Court of Ohio issued an Administrative Order that retroactively tolled the time requirements established by all Supreme Court-promulgated rules for the same period of time as Am.Sub.H.B. No. 197. *In re Tolling of Time Requirements Imposed by Rules Promulgated by Supreme Court & Use of Technology,* 158 Ohio St.3d 1447, 2020-Ohio-1166, 141 N.E.3d 974. The Supreme Court explained that this tolling event "effectively freezes time from March 9 until the expiration of the order. For example, if a deadline was set to expire on March 19 (10 days after the effective date of the order), then the deadline will now expire 10

days after the end of the emergency period. In contrast, if a time requirement expires on August 1, it still expires on August 1."[1]

{¶ 29} In light of Am.Sub.H.B. No. 197 and the Supreme Court of Ohio's Administrative Order, the trial court issued an order extending Woodard's statutory speedy-trial deadline. In doing so, the trial court found that Woodard's speedy-trial deadline was set to expire on June 13, 2020, and extended it to August 5, 2020.[2] However, before the August 5th deadline arrived, Woodard filed a time waiver on July 21, 2020, which waived his constitutional and statutory rights to a speedy trial. Because Woodard waived his right to a speedy trial before the statutory deadline, Woodard's statutory speedy-trial claim lacks merit.

{¶ 30} Also lacking merit is Woodard's claim that his constitutional right to a speedy trial was violated. To determine whether a defendant's constitutional right to a speedy trial was violated, courts apply the four-factor balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Under that test, courts should balance: (1) the length of the delay between accusation and trial; (2) the reason for the delay; (3) the defendant's assertion, if any, of his right to a speedy trial; and (4) the prejudice, if any, to the defendant. *Voris*, 2d Dist. Miami No. 2021-CA-2, 2022-Ohio-152,

---

[1] *See* https://www.supremecourt.ohio.gov/coronavirus/resources/tollingAnalysis_040220. pdf, *ASSESSING IMPACT of Tolling Legislation and Supreme Court Order upon Specific Time Requirements*

[2] The trial court stated in its entry that August 5, 2020, was the earliest date on which the court could safely conduct a jury trial. We note that August 5, 2020, does not correspond to the speedy-trial deadline authorized by the tolling order. Since Woodard's speedy trial time was scheduled to elapse on June 13, 2020 (96 days after the effective date of the tolling order), the tolling order would have permitted Woodard's speedy trial deadline to be extended to November 3, 2020.

at ¶ 16, citing *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) and *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 88.

**{¶ 31}** "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker* at 530. In other words, "a finding of 'presumptive prejudice' is merely a triggering mechanism under the first *Barker* factor, which justifies an inquiry into the other three factors." *Voris* at ¶ 24, citing *State v. Kraus*, 2d Dist. Greene No. 2011-CA-35, 2013-Ohio-393, ¶ 23. "A delay becomes presumptively prejudicial as it approaches one year in length." *Adams* at ¶ 90, citing *Doggett* at 652. If the delay is presumptively prejudicial, the other factors are then "balanced considering the totality of the circumstances, with no one factor controlling." *State v. Perkins*, 2d Dist. Clark No. 2008-CA-81, 2009-Ohio-3033, ¶ 8, citing *Barker*.

**{¶ 32}** In this case, the length of the delay in bringing Woodard to trial was exactly one year from the date of his arrest. While this triggers our review of the other three *Barker* factors, those factors do not weigh in favor of finding a constitutional speedy-trial violation. This is because the reason for the one-year delay was attributable to the tolling order caused by the COVID-19 pandemic, which was outside the trial court's control. It was also due to Woodard requesting new defense counsel two weeks before his scheduled trial, which resulted in a trial continuance. Furthermore, Woodard never asserted his right to a speedy trial in the court below, but instead waived that right by filing a time waiver. Woodard also failed to establish any prejudice arising from the one-year

delay in bringing him to trial. In any event, we find that a delay of one year was reasonable given the ongoing, unprecedented COVID-19 pandemic, which caused considerable backlogs and scheduling difficulties in the trial courts. Taking these factors into consideration, we also do not find a constitutional speedy-trial violation.

**{¶ 33}** Woodard's fifth assignment of error is overruled.


**First Assignment of Error**

**{¶ 34}** Under his first assignment of error, Woodard contends that the trial court erred during sentencing when it failed to merge his felonious assault and abduction offenses as allied offenses of similar import. Because Woodard never objected to the trial court's failure to merge those offenses, Woodard has waived all but plain error with regard to that issue. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21-22; *State v. King*, 2d Dist. Montgomery No. 29137, 2021-Ohio-4229, ¶ 28; *State v. Wilson*, 2d Dist. Clark No. 2018-CA-2, 2020-Ohio-2962, ¶ 119; *State v. Trigg*, 2d Dist. Montgomery No. 26757, 2016-Ohio-2752, ¶ 12. It is well-established, however, that a trial court's failure to merge allied offenses constitutes plain error. *King* at ¶ 28; *Wilson* at ¶ 119; *Trigg* at ¶ 12; *State v. Shoecraft*, 2d Dist. Montgomery No. 27860, 2018-Ohio-3920, ¶ 56. Therefore, we will review the merits of Woodard's argument.

**{¶ 35}** When a defendant's conduct supports multiple offenses, courts apply the allied offenses analysis set forth in R.C. 2941.25 to determine if the offenses merge or if the defendant may be convicted of separate offenses. R.C. 2941.25 provides that: "Where the same conduct by [a] defendant can be construed to constitute two or more

allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."   R.C. 2941.25(A).   The statute also provides that: "Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."   R.C. 2941.25(B).

{¶ 36} " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions * * *: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' "   *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31.   " 'An affirmative answer to any of the above will permit separate convictions.   The conduct, the animus, and the import must all be considered.' "   *Id.*

{¶ 37} Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable."   *Ruff* at ¶ 23.   Therefore, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense."   *Id.* at ¶ 26.   "The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses

have similar import." *Id.*

{¶ 38} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "one offense was complete before the other offense occurred, * * * notwithstanding their proximity in time and that one [offense] was committed in order to commit the other." *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. *Accord State v. Williams*, 12th Dist. Butler No. CA2018-02-030, 2018-Ohio-4261, ¶ 13; *State v. Margiotti*, 10th Dist. Franklin No. 19AP-469, 2021-Ohio-1826, ¶ 15-16; *State v. Spurrier*, 11th Dist. Lake No. 2020-L-069, 2021-Ohio-1061, ¶ 68. Therefore, "when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, 9 N.E.3d 443, ¶ 49 (2d Dist.).

{¶ 39} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff* at ¶ 26. " '[T]he defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act.' " *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987). An appellate court applies "a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 40} As previously discussed, Woodard claims that his felonious assault and abduction offenses were allied offenses of similar import that should have been merged

at sentencing. Woodard's abduction offense was charged under R.C. 2905.02(A)(2), which prohibits one without privilege from knowingly restraining the liberty of another person by force or threat under circumstances that create a risk of physical harm to the victim or place the other person in fear. "Physical harm" means any injury, illness, or other physiological impairment, regardless of its gravity or duration. R.C. 2901.01(A)(3).

{¶ 41} Woodard's felonious assault offense was charged under R.C. 2903.11(A)(1), which prohibits one from knowingly causing serious physical harm to another. Serious physical harm includes any physical harm "that involves some temporary, substantial incapacity." R.C. 2901.01(A)(5)(c). "Temporary unconsciousness constitutes a temporary substantial incapacity, and therefore serious physical harm." (Citations omitted.) *State v. Booker*, 2d Dist. Montgomery No. 22990, 2009-Ohio-1039, ¶ 16.

{¶ 42} After reviewing the record, we find that J.W.'s testimony established that Woodard completed the abduction offense after he became angry over discovering the Facebook message from his former boss, Stansell. Specifically, J.W.'s testimony established that Woodard knowingly restrained J.W.'s liberty by force and created a risk of physical harm to J.W. when he ordered J.W. to stay on the bed and pushed/hit her down on the bed every time she tried to get up. J.W.'s testimony also established that Woodard restrained her liberty by threat when Woodard threatened to tie her to the bed and to kill her, her mother, and her dog. Accordingly, the abduction was complete once Woodard engaged in the aforementioned conduct.

{¶ 43} J.W.'s testimony also established that it was not until Woodard

subsequently saw a different message from his co-worker, Jeremy, that Woodard committed the felonious assault by putting his hands around J.W.'s neck and choking her until she lost consciousness. Although the abduction and felonious assault occurred within close in time to one another, J.W.'s testimony established that Woodard had completed the offense of abduction before he commenced the felonious assault. Therefore, the two offenses were committed separately.

{¶ 44} The abduction and felonious assault also involved separate, identifiable harms. The harm from the abduction involved restraining J.W.'s liberty and causing J.W. risk of physical harm by pushing/hitting her down on the bed and by placing J.W. in fear for her life and the lives of her loved ones. The harm from the felonious assault involved Woodard choking J.W. to the point she lost consciousness. Therefore, because the abduction and felonious assault offenses were committed separately and involved separate, identifiable harms, the offenses were not allied offenses of similar import that merged for purposes of sentencing.

{¶ 45} Woodard's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 46} Under his second assignment of error, Woodard contends that the trial court erred by failing to give a jury instruction on aggravated assault as an inferior-degree offense to felonious assault.

{¶ 47} As a preliminary matter, we note that Woodard did not request a jury instruction on aggravated assault at trial or object to its omission. Woodard therefore

has waived all but plain error with regard to the trial court's failure to instruct the jury on aggravated assault. *See* Crim.R. 30(A). Plain error exists when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

{¶ 48} That said, "criminal defendants have the 'right to expect that the trial court will give complete jury instructions on all issues raised by the evidence.' " *State v. Rider*, 2d Dist. Champaign No. 2021-CA-12, 2022-Ohio-1964, ¶ 38, quoting *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990). "In deciding whether to provide a lesser-included or inferior-offense instruction, the court must find 'sufficient evidence' to allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser-included or inferior-degree offense." *Id.*, quoting *State v. Ferrell*, 2020-Ohio-6879, 165 N.E.3d 743, ¶ 35 (10th Dist.). "When the evidence presented at trial going to a lesser-included offense or inferior-degree offense meets this test, the trial judge must instruct the jury on the lesser-included or inferior-degree offense." *Id.*, citing *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 32 (2d Dist.).

{¶ 49} In this case, Woodard correctly argues that aggravated assault is an inferior-degree offense to felonious assault, " 'as it contains elements which are identical to the elements defining felonious assault, except for the additional mitigating element of serious provocation.' " *Conley* at ¶ 32, quoting *State v. Morrow*, 2d Dist. Clark No. 2002-

CA-37, 2002-Ohio-6527, fn. 2. "Specifically, felonious assault is reduced to aggravated assault if the offender is 'under the influence of sudden passion or in a sudden fit of rage * * * brought on by serious provocation occasioned by the victim.' " *Id.* at ¶ 33, quoting R.C. 2903.12(A). "Thus, in a trial for felonious assault, where the defendant presents sufficient evidence of serious provocation, an instruction on aggravated assault must be given to the jury." *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph four of the syllabus.

{¶ 50} "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." *Id.* at paragraph five of the syllabus. "In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." *Id.* The following two-part test is utilized to determine whether the provocation was reasonably sufficient to incite a defendant into using deadly force:

> First, an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence of sudden passion or in a sudden fit of rage."

*State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998), quoting *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992).

**{¶ 51}** Upon review, we find that the evidence presented at trial did not support an inferior-degree offense jury instruction on aggravated assault, because the evidence failed to establish that Woodard's attack on J.W. was the result of serious provocation *occasioned by J.W.* While there was no dispute that Woodard became extremely enraged over the messages he read on J.W.'s cell phone and over the thought of infidelity, the fact remained that Woodard's rage was not provoked by any actions or admissions of J.W. Rather, Woodard was provoked by messages that he chose to read, and J.W. had no control over the receipt or content of these messages.

**{¶ 52}** We also find, that under the specific circumstances of this case, the provocation at issue was not sufficient to arouse the passions of an ordinary person beyond the power of his or her control, and thus does not satisfy the objective prong of the serious provocation analysis. This is because an ordinary person in Woodard's position, i.e., a person who has been separated from his or her spouse for two months, has a new significant other, and wants a divorce, would not be expected to lose control and succumb to a fit of rage after simply learning that his or her estranged spouse receives messages from other *alleged* suitors. In our view, these circumstances would not incite or arouse the passions of an ordinary person beyond his or her control. Accordingly, because there was insufficient evidence of serious provocation, the trial court did not commit any error, plain or otherwise, by omitting a jury instruction on aggravated assault.

**{¶ 53}** Woodard's second assignment of error is overruled.

**Fourth Assignment of Error**

**{¶ 54}** Under his fourth assignment of error, Woodard contends that he was prejudiced by certain procedural irregularities that took place during his trial and sentencing. The first procedural irregularities Woodard is challenging are the replacement of Judge Wiseman with Judge Skelton at his trial and Judge Wiseman's return thereafter as the sentencing judge. Woodard claims that this did not comport with Crim.R. 25(A).

**{¶ 55}** Crim.R. 25(A) provides that:

> If for any reason the judge before whom a jury trial has commenced is unable to proceed with the trial, another judge designated by the administrative judge, or, in the case of a single-judge division, by the Chief Justice of the Supreme Court of Ohio, may proceed with and finish the trial, upon certifying in the record that he has familiarized himself with the record of the trial. If such other judge is satisfied that he cannot adequately familiarize himself with the record, he may in his discretion grant a new trial.

**{¶ 56}** Woodard argues that the trial court violated Crim.R. 25(A) because the record does not establish that the court's administrative judge ever designated Judge Skelton as Judge Wiseman's replacement. Woodard also argues that it can be inferred from Crim.R. 25(A) that the judge who presided over trial must also preside over sentencing. For this reason, Woodard claims that it was erroneous for Judge Wiseman

to return as the sentencing judge.

{¶ 57} As a preliminary matter, we note that Woodard failed to raise any of these arguments in the trial court. When Judge Skelton took over for Judge Wiseman on the second day of trial, Judge Skelton explained that Judge Wiseman had a potential COVID-19 exposure that required 10 days of isolation and that he was going to "fill in for Judge Wiseman for the remainder of the trial." Trial Tr. Vol. I (Mar. 4, 2021), p. 140. Judge Skelton also advised that "Judge Wiseman reserv[ed] the right, should a guilty verdict be found, to be the sentencing judge since it is her case." *Id.* Following these advisements, Judge Skelton gave each party an opportunity to make a statement regarding the matter. Neither party raised an objection to Judge Skelton's replacing Judge Wiseman for trial or to Judge Wiseman's possibly returning as the sentencing judge. When Judge Wiseman did later return as sentencing judge, Woodard once again failed to object.

{¶ 58} "It is a well-established rule that ' "an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." ' " *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15, quoting *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986), quoting *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus. More specifically, the Supreme Court of Ohio has explained that a defendant who fails to timely object to the substitution of a judge waives his right to challenge the reassignment. The Supreme Court stated that:

"[A]ny party objecting to a reassignment must raise that objection at the first opportunity to do so. If the party has knowledge of the transfer with sufficient time to object before the new judge takes any action, that party waives any objection to the transfer by failing to raise that issue on the record before the action is taken."

*In re Disqualification of Cirigliano*, 105 Ohio St.3d 1223, 826 N.E.2d 287, ¶ 26 (2004), quoting *Berger v. Berger*, 3 Ohio App.3d 125, 131, 443 N.E.2d 1375 (8th Dist.1981), *overruled on other grounds, Brickman & Sons, Inc. v. Natl. City Bank*, 106 Ohio St.3d 30, 2005-Ohio-3559, 830 N.E.2d 1151. *See also In re J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, 855 N.E.2d 851, ¶ 17 ("[a] party may timely object to the authority of a visiting judge on the basis of an improper case transfer or assignment, but failure to timely enter such an objection waives the procedural error.") *Accord State v. Scurlock*, 6th Dist. Lucas No. L-15-1200, 2017-Ohio-1219, ¶ 57 (holding that appellant's right to challenge the authority of a sentencing judge who had the case transferred back to him after the completion of trial was waived by appellant's failure to object); *State v. B.J.T.*, 2017-Ohio-8797, 101 N.E.3d 62, ¶ 40 (12th Dist.).

{¶ 59} Because Woodard never objected to Judge Skelton's substitution for Judge Wiseman at trial or to Judge Wiseman's return as the sentencing judge, Woodard has waived all but plain error for appeal with regard to those issues. *See State v. Sylvester*, 8th Dist. Cuyahoga No. 103841, 2016-Ohio-5710, ¶ 31-32; *State v. Williams*, 1st Dist. Hamilton No. C-150249, 2016-Ohio-5827, 71 N.E.3d 592, ¶ 54-55. To constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must

have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). As previously discussed, plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise" and should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph two and three of the syllabus.

{¶ 60} With regard to Woodard's argument that there is nothing in the record indicating that the administrative judge designated Judge Skelton as Judge Wiseman's replacement as required by Crim.R. 25(A), we fail to see how this alleged error affected a substantial right. Woodard did not argue, let alone demonstrate, that the outcome of his trial would have been different had there been some indication in the record that Judge Skelton was appointed by the trial court's administrative judge. Accordingly, we find no plain error with regard to that argument. *See Sylvester* at ¶ 32, (finding no plain error in allowing a substitute judge to receive a jury's verdict and schedule the matter for sentencing despite the absence of evidence showing that the judge had been properly selected by the administrative judge).

{¶ 61} Woodard has also failed to demonstrate plain error with regard to Judge Wiseman's return as the sentencing judge. Woodard argues that it can be inferred from Crim.R. 25(A) that the judge who presided over trial must also preside over sentencing. In support of this argument, Woodard cites *Beatty v. Alston*, 43 Ohio St.2d 126, 330 N.E.2d 921 (1975), a case which actually pertains to Crim.R. 25(B) rather than Crim.R. 25(A). Unlike Crim.R. 25(A), which governs when a judge cannot proceed with trial after

trial has already commenced, Crim.R. 25(B) governs when a judge is unable to perform the duties of the court after a verdict has already been entered. However, similar to Crim.R. 25(A), Crim.R. 25(B) permits the administrative judge to designate a replacement judge.

{¶ 62} In *Beatty*, the Supreme Court of Ohio explained that Crim.R. 25(B) "inferentially commands that unless unable to do so, the judge who presided at a criminal trial must also preside at post-conviction proceedings, including sentencing." *Beatty* at 127. *Beatty* concerned a situation where a municipal court judge, who did not preside over the defendant's jury trial, sentenced the defendant for the offense of which he was found guilty, thus usurping the presiding judge's authority to sentence the defendant. The Supreme Court of Ohio held that under the authority vested in the presiding judge by Crim.R. 25(B), it was appropriate for the presiding judge to vacate the other judge's sentence and to sentence the defendant again. *Id.* at 128. Therefore, Crim.R. 25(B) "does not favor sentencing by judges unfamiliar with the defendant and the facts of the case against him." *State v. Roper*, 9th Dist. Summit No. 23454, 2008-Ohio-1053, ¶ 15, citing *Beatty* at 127.

{¶ 63} Under the logic of *Beatty*, either Judge Wiseman or Judge Skelton had authority to sentence Woodard, as both judges presided over Woodard's trial. Judge Wiseman arguably presided over one of the most important parts of the trial, the testimony of the victim. Not only did Judge Wiseman preside over a portion of the trial, but she also handled Woodard's case for approximately one year before trial began. Therefore, even though Judge Wiseman did not preside over the entire trial, she was familiar with

Woodard and the facts of the case and was capable of sentencing him. *See Roper* at ¶ 15-16. Accordingly, Woodard has failed to demonstrate an obvious error with regard to Judge Wiseman's sentencing him for purposes of establishing plain error.

{¶ 64} Even if we were to accept Woodard's claim that Crim.R. 25(A) required Judge Skelton to be the sentencing Judge, any claim of resulting prejudice, i.e., that his sentence would have been more lenient had Judge Skelton sentenced him, is pure speculation. It is well established that speculation is insufficient to support a finding of plain error. *State v. Frazier*, 2d Dist. Clark No. 2018-CA-33, 2019-Ohio-1546, ¶ 32, citing *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 108 (finding no plain error when the accused's claim "is totally speculative"); *State v. Sanders*, 92 Ohio St.3d 245, 265, 750 N.E.2d 90 (2001) (finding no plain error because defendant's claim "rests wholly on speculation" and "it is not clear that the outcome would have been otherwise but for the error"); *State v. Belcher*, 2d Dist. Montgomery No. 24968, 2013-Ohio-1234, ¶ 66 (finding no plain error "because any finding of prejudice would have to rely on speculation").

{¶ 65} For the foregoing reasons, Woodard has failed to establish that the replacement of Judge Wiseman with Judge Skelton at his trial or Judge Wiseman's return as the sentencing judge resulted in plain error.

{¶ 66} The other procedural irregularity that Woodard challenges on appeal is the trial court's appointment of new defense counsel for purposes of sentencing. Woodard claims that appointing new counsel for sentencing prejudiced him because his new counsel did not have the benefit of attending his trial. Specifically, Woodard argues that

it is questionable whether his new counsel had the opportunity to review the discovery and the trial transcript in order to become familiar with his case.

{¶ 67} Contrary to Woodard's claim otherwise, the record indicates that Woodard's new counsel had the opportunity to familiarize himself with Woodard's case, as the trial court granted counsel a two-week continuance of the sentencing hearing for that purpose. Woodard's new counsel also made statements at the sentencing hearing which indicated that counsel had reviewed the trial transcript. Specifically, Woodard's new counsel stated that: "[T]here's some discrepancy whether it be through his former counsel or just directly to the Court or even I think to the prosecutor *during the trial that I reviewed* that he – he never took responsibility for his actions." (Emphasis added.) Sentencing Tr. Vol. II (Apr. 27, 2021), p. 441. Counsel also stated: "Your Honor, I – you know, we don't hide – we don't hide away from the fact that *the facts were bad and the facts that came out at trial were bad.*" (Emphasis added.) *Id*. at 442. Therefore, because the record indicates that Woodard's new counsel had the opportunity to review the case materials and made statements at the sentencing hearing indicating that he had in fact conducted such a review, Woodard's claim of prejudice lacks merit.

{¶ 68} Woodard's fourth assignment of error is overruled.


**Third Assignment of Error**

{¶ 69} Under his third assignment of error, Woodard contends that his trial counsel provided ineffective assistance by failing to: (1) request a jury instruction on aggravated assault; (2) subpoena J.W.'s cell phone records; (3) subpoena three witnesses for trial,

i.e., Tim Stansell, Jeremy Webb, and Mark Tyree; (4) obtain a forensic physician to access whether J.W.'s injuries were the product of self-harm; (5) object to Judge Wiseman's acting as sentencing Judge; and (6) argue for the merger of his felonious assault and abduction offenses.

{¶ 70} In order to succeed on an ineffective assistance claim, a defendant must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Strickland* at 688; *Bradley* at 142. To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 71} In reviewing ineffective assistance claims, " 'we will not second-guess trial strategy decisions, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " *State v. English*, 2d Dist. Montgomery No. 26337, 2015-Ohio-1665, ¶ 10, quoting *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998), quoting *Strickland* at 689. Therefore, " 'trial

counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2d Dist. Miami No. 2010-CA-22, 2011-Ohio-4475, ¶ 15, quoting *State v. Olsen*, 2d Dist. Clark No. 2009-CA-110, 2011-Ohio-3420, ¶ 121. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

**{¶ 72}** Woodard first claims that his trial counsel performed deficiently by failing to request a jury instruction on aggravated assault as an inferior-degree offense to felonious assault. Because we have already determined that the trial court did not err by failing to give such an instruction, Woodard's claim that his trial counsel was deficient in that regard lacks merit. As previously discussed, an instruction on aggravated assault was not warranted by the evidence presented at trial. Therefore, Woodard not only failed to demonstrate that his counsel's failure to request an aggravated assault instruction fell below an objective standard of reasonable representation, but he also failed to demonstrate any resulting prejudice. Accordingly, Woodard's first ineffective assistance of counsel claim lacks merit.

**{¶ 73}** Woodard also claims that his trial counsel performed deficiently by failing to subpoena J.W.'s cell phone records, failing to subpoena Stansell, Webb, and Tyree as trial witnesses, and failing to obtain a forensic physician to assess whether J.W.'s injuries were the product of self-harm. All of these failures, however, are within the purview of trial strategy, which cannot form the basis of an ineffective assistance claim. *See State*

*v. Bennett*, 6th Dist. Wood No. WD-08-005, 2008-Ohio-5812, ¶ 11("Discovery decisions are presumed to be trial strategies which do not constitute ineffective assistance of counsel."); *State v. McCoy*, 188 Ohio App.3d 152, 2010-Ohio-2639, 934 N.E.2d 971, ¶ 51 (2d Dist.) ("counsel's failure to subpoena tapes would have been a matter of trial strategy"); *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 113 ("Counsel's decision to call a witness is a matter of trial strategy"); *State v. Treesh*, 90 Ohio St.3d 460, 489, 739 N.E.2d 749 (2001) ("counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court"); *State v. Jackson*, 10th Dist. Franklin No. 02AP–867, 2003-Ohio-6183, ¶ 76. ("trial counsel's decision not to seek expert testimony is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.")   Because even a debatable decision concerning trial strategy cannot form the basis of a claim for ineffective assistance of counsel, *Conley*, 2015-Ohio-2553, 43 N.E.3d 775, at ¶ 56, Woodard's claims that his trial counsel was ineffective for failing to subpoena the cell phone records and witnesses at issue and for failing to obtain a forensic physician to assess J.W.'s injuries lack merit.

{¶ 74} We also note that Woodard has failed to explain how the cell phone records, witness testimony, and forensic assessment would have assisted his defense.   Although Woodard argues that a forensic assessment of J.W.'s injuries would have been "essential" to his defense, it remains purely speculative as to whether a forensic physician would have concluded that J.W.'s injuries were the result of self-harm.   "Such speculation is insufficient to establish ineffective assistance."   *State v. Short*, 129 Ohio

St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119, citing *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217. *See also State v. Fraker*, 3d Dist. Union No. 14-12-19, 2013-Ohio-4561, ¶ 53 (holding that an ineffective assistance claim could not be based on counsel's failure to obtain a medical expert who could have provided an alternative causation for the victim's injuries because the court could not speculate as to whether an alternative causation would have actually been argued or established by the expert). Therefore, Woodard has not only failed to establish deficient performance on the part of his trial counsel, but also that he was prejudiced by counsel's failures with regard to the cell phone records, witness testimony, and forensic assessment. Accordingly, the ineffective assistance claims based on those matters fail.

{¶ 75} Woodard next contends that his trial counsel performed deficiently by failing to object to Judge Wiseman's sentencing him as opposed to Judge Skelton. However, as discussed under Woodard's fourth assignment of error, it was appropriate for Judge Wiseman to sentence Woodard since she had presided over a portion of his trial and was familiar with his case. Furthermore, it is possible that Woodard's trial counsel believed that it was advantageous to have Judge Wiseman sentence Woodard, making the failure to object a matter of trial strategy that cannot form the basis of an ineffective assistance claim. Accordingly, Woodard failed to demonstrate deficient performance on the part of his counsel. Woodard also cannot establish that he was prejudiced by Judge Wiseman's sentencing him, as it is pure speculation that Judge Skelton would have imposed a more lenient sentence. As previously discussed, "mere speculation cannot support either the deficient performance or prejudice requirement of an ineffective-assistance claim." *State*

*v. Morgan*, 2d Dist. Montgomery No. 27774, 2018-Ohio-3198, ¶ 16, citing *Short* at ¶ 119 and *Perez* at ¶ 217.

{¶ **76**} For his last ineffective-assistance argument, Woodard contends that his trial counsel performed deficiently by failing to argue for the merger of his felonious assault and abduction offenses at sentencing. However, as discussed under Woodard's first assignment of error, the trial court correctly decided not to merge those offenses as allied offenses of similar import since they were committed separately and involved separate, identifiable harms. Thus, Woodard's claim that his trial counsel performed deficiently by failing to object to the trial court's merger determination lacks merit, as the failure to object was simply a product of Woodard's counsel's following the law. Because Woodard failed to establish that his trial counsel's performance was deficient and prejudicial, all six of his ineffective assistance of counsel claims fail.

{¶ **77**} Woodard's third assignment of error is overruled.

## Conclusion

{¶ **78**} Having overruled all five assignments of error raised by Woodard, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French

Lisa M. Light
J. David Turner
Hon. Mary Lynn Wiseman